

## THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION

| | | |
|---|---|---|
| LUCAS GEORGANDELLIS, M.D., | : | |
| Plaintiff | : | |
| vs. | : | |
| HOLZER CLINIC, INC. | : | |
| and | : | |
| HOLZER MEDICAL CENTER, INC. | : | |
| and | : | **COMPLAINT** |
| WAYNE MUNRO, M.D. | : | **JURY DEMAND** |
| and | : | |
| JON SULLIVAN, M.D. | : | JUDGE   JUDGE MARBLEY |
| and | : | CASE NUMBER |
| MICHAEL CANADY, M.D. | : | MAGISTRATE JUDGE KING |
| and | : | 2:08 cv 626 |
| JAMAAL HADDAD, D.O. | : | |
| and | : | |
| JAMES PHILLIPPE | : | |
| and | : | |
| ROBERT DANIELS | : | |
| and | : | |
| PAT CONNORS | : | |
| Defendants. | : | |

1

## **COMPLAINT**

### I. JURISDICTION

1. This Court has jurisdiction pursuant to 28 U.S.C. §1331, 31 U.S.C. §3730(h)(False Claim Whistleblower) and 15 U.S.C.§15(a)(Anti-trust). This Court has supplemental jurisdiction over state claims pursuant to 28 U.S.C.§1367.

### II. PARTIES

2. Plaintiff Lucas Georgandellis, MD (hereinafter plaintiff) is a nephrology and critical care physician and a resident of Gallipolis, Gallia County, Ohio. Plaintiff is a fellow of the American Society of Nephrology and fellow of the American College of Chest Physicians and has been recertfied in 2007 in Nephrology and Critical Care Medicine.

3. Defendant Holzer Clinic is a medical care provider with nine locations in Southeastern Ohio and Western West Virginia and consists of 94 physician shareholders and 50 salaried physicians.

4. Defendant Holzer Medical Center is a hospital located in Gallipolis, Gallia County, Ohio. A large majority of the physicians with privileges at the Holzer Medical Center are shareholders or salaried employees of the Holzer Clinic. The physicians of the Holzer Clinic staff the committees at the Holzer Medical Center

5. Defendant Wayne Munro, MD at all times relevant to this Complaint has been President of the Holzer Clinic.

6. Defendant Jon Sullivan, MD at all times relevant to this Complaint has been Vice President of the Holzer Clinic.

7. Defendant Michael Canady, MD at all times relevant to this Complaint has been a

2

shareholder at the Holzer Clinic and Chief of Surgery at the Holzer Medical Center.

8. Defendant Jamaal Haddad, DO at all times relevant to this Complaint has been President of the Holzer Medical Center Medical Staff.

9. James Phillippe at all times relevant to this Complaint has been the Chief Executive Officer of the Holzer Medical Center.

10. Robert Daniels at all times relevant to this Complaint has been Chief Administrator of the Holzer Clinic.

11. Pat Connors at all times relevant to this Complaint has been Vice Administrator of the Holzer Clinic.

## III. FACTS

12. Plaintiff Lucas Georgandellis,, MD, FASN, FCCP joined the Holzer Clinic in February, 2003 as a salaried employee leaving a highly successful medical practice of Nephrology and Critical Care in Detroit. Plaintiff had a 30 year unblemished record in Michigan and served on the staff of ten hospitals and has been awarded fellowships by the American College of Chest Physicians (FCCP) and the American Society of Nephrology (FASN).

13. Plaintiff became a shareholder of the Holzer Clinic in April of 2005 and at all times relevant to this Complaint had privileges at the Holzer Medical Center.

14. At the time that he was recruited, it was anticipated that he would expand the newly established dialysis unit at the Holzer Medical Center. During his employment, the Plaintiff succeeded in quadrupling the number of dialysis patients.

15. The Code of Regulations of Holzer Clinic (Exhibit A) sets forth the rights and obligations of shareholders of the Holzer Clinic, including termination and a "protective

3

covenant." Article XXI provides that "any individual who leaves the group causes substantial harm and damage to the group" and therefore each shareholder is required to sign a protective covenant. Article XXVIII provides that a shareholder's association "may be terminated at any time but only by the affirmative vote of two-thirds (2/3) of the common shareholders at a shareholder meeting called expressly to consider termination."

16. The Physicians' Administrative Policy (exhibit B to this Complaint) sets forth a progressive policy for disciplining shareholders. The policy requires that a shareholder commit five violations of Clinic policies within a three year period in order to be terminated.

17. The Holzer Clinic required as a condition of plaintiff's employment that plaintiff agree not to engage in the practice of medicine for two years after the termination of his employment within 30 miles of the Clinic's primary care facility in Gallipolis, Ohio and within 15 miles of any other facility operated by the Clinic. The "Protective Covenant" is attached as Exhibit C to this Complaint.

18. In 2004, the Holzer Clinic and the Holzer Medical Center established a joint program to perform cardiothoracic surgery. The first physician involved with the program, Michael Lewis, MD, left the program after a brief tenure.

19. Subsequently, Raj Gulati, MD was hired to perform cardiothoracic surgery in 2004, and a third surgeon, Michael Swanson, DO was hired by the Holzer Clinic to work with the joint program.

20. Because of credentialing issues and/or inexperience, Dr. Swanson was permitted to undertake cardiothoracic surgery only on the condition that Dr. Gulati supervise his surgeries.

21. The President of the Medical Staff, Rebecca Strafford, MD, the Medical Credentials

Committee of Holzer Medical Center, the Medical Executive Committee of the Holzer Medical Center, and the Holzer Medical Center's Board of Trustees were of the opinion that Dr. Swanson had failed to do a sufficient number of cardiac cases where he had primary responsibility during the previous nine years.

22. Dr. Strafford and other members of management could not verify that Dr. Swanson had met the minimum standard of 50 cases per year in the previous two years, without supervision, to allow him to be credentialed to work without supervision.

23. As a result, the Holzer Medical Center required that Dr. Swanson be supervised by Dr. Gulati for 50 cases before he would be permitted to undertake cardiothoracic surgery without supervision. The letter credentialing Dr. Swanson to perform surgeries at the Holzer Medical Center stated that he was authorized to perform cardiothoracic surgeries as long as another cardiothoracic surgeon was in attendance.

24. In May 2005, open heart surgery for a Holzer Medical Center patient, Rozalie Bush, was scheduled for May 9, 2005 at a time when Dr. Gulati planned to be on vacation. Dr. Gulati objected to Dr. Swanson performing the surgery while he was on vacation, because of his concerns that Dr. Swanson was not qualified to perform the surgery without supervision.

25. Dr. Gulati informed Dr. Canady, Dr. Connors, and Dr. Munro that Dr. Swanson should not be permitted to operate without supervision and that he needed to be proctored.

26. Further, Dr. Gulati informed these physicians that the procedure could be deferred until he returned from his vacation and that if an emergency developed, then Mrs. Bush should be transferred to another facility.

27. Despite Dr. Gulati's objections, Dr. Canady told him that he would assist with the

surgery even though he was not a cardiothoracic surgeon and not qualified to proctor Dr. Swanson during open heart surgery. Dr. Canady knew that Dr. Swanson was required by the Holzer Medical Center to be proctored by a cardiothoracic surgeon and nonetheless indicated that he would allow Dr. Swanson to proceed with the surgery.

28. In his absence, Dr. Gulati's name was falsely put on the surgical schedule for Mrs. Bush's, suggesting that Dr. Gulati had approved of and/or would be present during the surgery. Based on information and belief, Dr. Canady was aware that Dr. Gulati's name was on the surgery schedule.

29. Despite knowledge of the established limitations on Dr. Swanson's ability to conduct open heart surgery, and the express requirement that a second cardiothoracic surgeon be present to supervise him, Dr. Canady allowed Dr. Swanson to operate alone on Mrs. Bush.

30. The decision to allow Dr. Swanson to operate under these circumstances was also done with the tacit approval of Dr. Naci Bozkir, MD, Chief of Surgery of Holzer Medical Center, and the Holzer Clinic Administrators Robert Daniels and Pat Connors, as well as Holzer Clinic President Dr. Munro, Vice President Dr. Sullivan, CEO of Holzer Medical Center Dr. Phillippe, and Tom Tope, President of the Holzer Medical Center Board of Trustees, all of whom knew that Dr. Swanson was not credentialed to perform the surgery without supervision.

31. Dr. Swanson was grossly negligent in performing the operation, and Mrs. Bush died as a direct and proximate result of his negligence.

32. Subsequently, the Bush family filed a medical malpractice complaint against Dr. Swanson, the Holzer Medical Center and the Holzer Clinic in the Gallia County Court of Common Pleas, which was recently settled.

33. The then President of the Medical Staff of the Holzer Medical Center, Rebecca Strafford, MD asked the Plaintiff in his role as Vice Chairman of the PEER Review & Quality Assurance Committee of Holzer Medical Center in July, 2006 (in the absence of the Chairman John Viall, MD) to complete the investigation that had been initiated by Dr. Strafford and Dr. Viall in May, 2005 to determine what had occurred in the course of Mrs. Bush's operation and whether there were errors and omissions on the part of the physicians and/or staff involved. .

34. Dr. Canady instructed Dr. Swanson not to appear before the Peer Review and Quality Assurance Committee chaired by the Plaintiff and discouraged other witnesses from offering testimony as to what occurred.

35. The Plaintiff determined that Mrs. Bush died because of the gross negligence of Dr. Swanson when he removed a critical clamp in the heart lung machine circuit resulting in a loss of oxygen, and in refusing to respond to concerns raised by the nurses, staff, and other physicians involved in the surgery concerning the status of the patient. The Plaintiff reported his findings to the Defendants including the malpractice of Dr. Swanson.

36. Separately, Holzer Medical Center and/or Holzer Clinic and/or the Defendants requested that Dr. Walter Merrill, an outside consultant, conduct a review of the program.

37. The Defendants deliberately instructed Dr. Gulati and other members of the staff not to discuss the specifics of the Bush case with Dr. Merrill. As a result, Dr. Merrill was unaware of Dr. Swanson's negligence and ascribed her death to "equipment malfunction."

38. Based on information and belief, employees and shareholders of the Holzer Clinic, as well as members of the nursing staff, did not talk to Dr. Merrill about the Bush case because of fears of retaliation.

39. Dr. Strafford requested that the Plaintiff review Dr. Merrill's findings as part of the PEER Review & Quality Assurance investigation previously commenced regarding the death of Mrs. Bush. The Plaintiff encountered the same resistance from the Defendants in his efforts to evaluate the alleged "equipment malfunction."

40. Following Mrs. Bush's death, her daughter-in-law Betty Bush, who worked as an admission clerk at the Holzer Medical Center, informed the Joint Commission on Accreditation (Joint Commission or JCAHO), a private non-profit organization that reviews practices at medical care facilities and sentinel (incidents that result in serious injury or death) and accredits health care facilities.

41. The United States Department of Health and Human Services' Medicare and Medicaid Services (CMS) relies on finding by JCAHO in determining whether health care facilities meet the requirements of CMS.

42. The JCAHO reviewed patient care issues at the Holzer Medical Center on four occasions between August 2005 and March 2007.

43. The Holzer Clinic refused to permit the Plaintiff, Dr. Gulati, or other members of the staff to provide information to the JCAHO relevant to Mrs. Bush's charges when it visited in August, 2005 or during subsequent visits.

44. Dr. Swanson, with the knowledge of the Defendants, continued to act negligently in operating on patients. For instance, Dr. Swanson caused the grievous crippling injury of Helen Armstrong in September, 2005 by inserting a chest tube into her stomach, giving her fecal peritonitis requiring major surgery.

45. Because of Dr. Swanson's lack of competence and because he had previously refused to follow Dr. Gulati's instructions, the latter refused to work with him, concerned about Dr. Swanson's incompetence, his risks to patients, the effects on his reputation, and the likelihood of litigation against him.

46. Defendant Dr. Canady in his new capacity as Chief of Surgery of Holzer Medical Center and Holzer Clinic threatened in October 2005 to terminate Dr. Gulati if he refused to supervise Dr. Swanson. When Dr. Gulati continued to object for the reasons set forth, Dr, Canady and the seven member physician Medical Board of Holzer Clinic demanded that he either resign or be fired by the Defendants,. Dr. Gulati was forced to resign.

47. Following Dr. Gulati's resignation, Dr. Swanson worked by himself and either injured or placed at risk numerous patients, estimated to be at least a dozen, including patients of the Plaintiff, because of his incompetence and gross negligence.

48. Dr. Swanson performed arteriovenous dialysis shunts, even though he was never trained in the procedure and had never done this procedure before. Dr. Swanson never established his qualifications and provided no documentation to the Defendants with respect to this procedure before or after he was hired. Defendants knew or should have known of Dr. Swanson's gross negligence.

49. In October/November, 2005, the Defendants removed the Plaintiff from the PEER/QA Hospital Committee and the Risk Management Committee of the Holzer Clinic.

50. The Plaintiff repeatedly informed the Defendants from July, 2005 until Dr. Swanson's departure in June, 2007 about the latter's gross negligence and the risk that he presented to patients. The Plaintiff informed the Defendants verbally and in writing that Dr.

9

Swanson, the Holzer Clinic, and Holzer Medical Center were engaging in criminal conduct that jeopardized the lives of his and other physicians' patients.

51. Because "he made Dr. Swanson feel uncomfortable," the Plaintiff was moved out of his office which was next to Dr; Swanson's, He was transferred to an office that lacked knowledgeable personnel required to perform the complex work of Nephrology and Critical Care which substantially affected his ability to properly care for his patients.

52. The Plaintiff continued to complain about Dr. Swanson's negligence, and specifically his injuries to his patients, to the Defendants in March-April, 2006, repeating that Swanson was incompetent, that he was causing the death of patients, that he was jeopardizing the lives of patients and putting the Medical Center and Clinic in jeopardy, that the Defendants were failing to act, and that it was fraud to bill Medicare for surgeries performed by an unqualified physician.

53. The Plaintiff advised the Defendants that if the situation did not improve, he would contact JCAHO and the police.

54. The Defendants continued to retaliate against the Plaintiff with the objective of forcing him to leave the staff of the Holzer Clinic and Holzer Medical Center, fabricating charges against the Plaintiff, and placing him on administrative leave with the condition that if he did not go to the Kansas Professional Renewal Center for Psychological Counseling, he would be terminated. The Defendants also cancelled the Plaintiff's medical malpractice insurance.

55. The Kansas Professional Renewal Center, after a 5 week/7 hour daily examination including intense psychiatric and psychological counseling and substance abuse testing, concluded that there was no basis to prevent the Plaintiff from practicing medicine. As a result, the Defendants had to reinstate the Plaintiff.

56. The Plaintiff continued to inform the Defendants about Dr. Swanson's gross negligence and their failure to take appropriate action to protect patients, members of the staff, and shareholders as well as continued Medicare fraud.

57. In January of 2007, the Plaintiff was required for a second time to receive a psychological evaluation and counseling from a local psychologist, Dr. Bruce Clay. Dr. Clay determined that the Plaintiff was fit to practice medicine and forwarded a favorable report to the Holzer Clinic Board of Trustees.

58. The Defendants did not report Dr. Swanson's conduct to state and federal authorities despite their obligation to do so.

59. In April, 2007, the Plaintiff objected to Dr. Canady's reelection as Chief of Surgery. because the By-Laws of the Holzer Medical Center prohibited any physician "who has committed an unethical and or illegal act" from being elected as Chief of any Department. The Plaintiff charged that Dr. Canady had committed unethical and illegal acts by allowing Dr. Swanson to operate without supervision..

60. In response to the Plaintiff's insistence that Dr. Canady resign as Chief of Surgery, the Holzer Clinic and Holzer Medical Center insisted on "proof "of his complicity.

61. The Plaintiff answered that the evidence was in the minutes of the PEER Review that the Plaintiff had conducted in July, 2005 where several witnesses described Dr.Canady's conduct.

62. The Holzer Clinic disregarded the Plaintiff's response and specifically his request for the minutes of the PEER review and fined him $1,000 every month until "he apologized to Dr.

Canady for stating that he had allowed the forging of Dr. Gulati's name in the operating room schedule."

63. The Plaintiff contacted the United States Center for Medicare and Medicaid (CMS) and the Ohio Medical Board numerous times between April of 2006 and January of 2008 about Dr. Swanson's malpractice and the fraud that had been committed by management officials at Holzer Clinic and Holzer Medical Center.

64. In May, 2007, a patient's son complained to CMS about substandard care that his father had received from the Holzer Clinic, Holzer Medical Center, and Dr. Swanson. CMS questioned the results of JCAHO's multiple visits and referred the complaint to the State Medical Board of Ohio in May, 2007.

65. The Ohio Medical Board issued a 15 page report listing numerous deficiencies, providing the Holzer Medical Center only a brief period to correct them.

66. As a result of the investigations, Dr. Swanson's contract was not renewed, and he was not proposed for shareholder status in the Holzer Clinic. In addition, 50 employees were laid off from the Holzer Medical Center, including the Director of Nursing and Vice Administrator.

67. Despite the efforts of the Plaintiff to establish the truth of what occurred with respect to the death of Mrs. Bush, the complicity of several of the Defendants, the presence of fraud, and the protection of patients of the Clinic and Medical Center and his fellow shareholders, the Defendants continued to retaliate against the Plaintiff, increasing the sanctions against him..

68. The Defendants again placed the Plaintiff on administrative leave and suspended him in September, 2007. He was required *for a third time* to receive psychological evaluation and counseling.

69. After three days of intense physical and psychological testing, the Vanderbilt Comprehensive Assessment Program found the Plaintiff psychologically and physically fit to practice medicine.

70. Upon the Plaintiff's return, his attorney requested Holzer Clinic through their counsel to hold a special meeting with the Board and Dr. Canady in order to challenge Dr. Canady's denial that he committed unethical/illegal acts. The Defendants continued to impose a $1,000 monthly fine on the Plaintiff until he agreed to retract his allegations against Dr. Canady.

71. The Defendants instead held a Special Shareholder Meeting to discuss the Plaintiff's termination on November 1, 2007. At this meeting all shareholders present were specifically told not to discuss the Bush case, Dr. Canady's culpability, or any of Dr. Swanson's multiple failed surgeries. The shareholders voted not to terminate the Plaintiff, and he was permitted to return to work.

72. Despite the refusal of the shareholders to terminate the Plaintiff, the Defendants continued to harass the Plaintiff. They demanded that he stop performing Quality Assurance work. The Plaintiff refused because, as the Nephrology Dialysis Director, he was required by the federal law to do Quality Assurance.

73. On December 31, 2007, the Defendants placed the Plaintiff on unpaid suspension and suspended his malpractice insurance coverage. Dr. Sullivan, in a letter dated December 31, 2007 (Exhibit D to this Complaint), told the Plaintiff that he was placed on unpaid suspension in part because he discussed Dr. Swanson's handling of the Bush case after he had "been repeatedly instructed not to do so" and that he said that he would be suing the Administration and the Clinic.

13

74. The Plaintiff had never threatened to sue the Clinic but only the Administrators and the responsible physicians whose negligence and/or complicity caused the failures involved with the joint cardiac thoracic program and injuries to his patients. He told the shareholders that the top administrators were involved in criminal activities and fraud.

75. The Plaintiff was not permitted to return to work after December 31, 2007.

76. On January 16, 2008, the Plaintiff presented a tape to the Holzer Clinic Medical Board and the Defendants containing a recording that Dr. Gulati had made in October, 2005 in which Dr. Canady admitted his culpability and/or responsibility in the Bush case and his threat to fire Dr. Gulati.

77. The Plaintiff offered this tape as well as a transcript of the phone conversation and an earlier letter from Dr. Gulati in response to the Defendants' demand that he provide proof of Dr. Canady's complicity and in order to stop the Plaintiff's monthly $1,000 fine.

78. The Defendants conspired to prevent the Plaintiff from presenting the tape or transcript of the conversation or the letter from Dr. Gulati to the shareholders.

79. On January 23, 2008, the Defendants called a special meeting in order to terminate the Plaintiff, failing to inform the shareholders of the true purpose of the scheduled meeting

80. The Defendants represented to the shareholders that the meeting was being held to discuss the employment/shareholder status of the Plaintiff (Exhibit E), that they were planning to "bargain' with the Plaintiff, and sought the shareholders' proxies for that purpose. Based on information and belief, a number of proxies were obtained by the Defendants through coercion.

81. The notice to shareholders for the special meeting was substantially different than the earlier notice of November 1, 2007 in which shareholders were specifically informed that the

Clinic was going to discuss the Plaintiff's termination. (Exhibit F)

82. The Defendants failed to inform the shareholders that they had previously made offers to the Plaintiff that had been rejected and that it was unlikely that efforts at further bargaining would be successful. The Plaintiff had refused these offers because he would have been required as a condition from criticizing the hospital and/or the Clinic, and specifically the effort to cover up Dr. Swanson's conduct and the Defendants' complicity.

83. Holzer Clinic President Munro during the January 23 meeting gave the Plaintiff only eight and a half minutes to respond to multiple new and unfounded accusations, which had never provided to the Plaintiff despite the Clinic's by-laws. The Plaintiff was not given the opportunity to ascertain the veracity of any of the accusations and was terminated at the end of the meeting.

84. The Defendants' actions were malicious and with wonton disregard for the rights of the Plaintiff.

85. As a result of the Defendants' conduct, the Plaintiff has suffered a loss of employment, the ability to practice medicine in the community of his choice, loss of income, and severe emotional and mental distress.

86. The Plaintiff has made diligent efforts, without success, to find another position.

## IV. CLAIMS

### A. FALSE CLAIMS ACT WHISTLEBLOWER CLAIM

87. Defendants harassed, required plaintiff to obtain psychological treatment, suspended, and terminated plaintiff because he had acted in furtherance of the False Claims Act, thereby violating the Whistleblower provision of the False Claims Act, 31 U.S.C. §3730 (h).

### B. FEDERAL AND STATE ANTI-TRUST CLAIMS

88. The "protective covenant" that Holzer required plaintiff to sign was an unreasonable restraint of competition in violation of the federal and state anti-trust laws.

89. Plaintiff is a critical care physician and nephrologist. Both critical care physicians and nephrologists are in high demand in the area along the Ohio River (in both West Virginia and Ohio) within 30 miles from Gallipolis.

90. If the protective covenant is enforced, it would prevent people in that area from obtaining the services of a highly qualified physician. Plaintiff's wife, Susan Rossi, MD, FRCS(C) is an ENT physician-surgeon and shareholder at the Holzer Clinic and Hospital, and plaintiff therefore will be unable to readily move elsewhere. Defendants have informed plaintiff that they will enforce the "protective covenant" if plaintiff attempts to obtain a job locally, and defendants have acted to prevent plaintiff from obtaining another position within 30 miles of the Holzer Medical Center.

91. Preventing the Plaintiff from practicing nephrology within the area served by Holzer Medical Center will effectively prevent patients and members of the community who are in need of the skills offered by the Plaintiff from receiving necessary assistance.

92. The "protective covenant" would prevent plaintiff from working in hospitals in Charleston and Huntington, W.V. as well as Jackson, Athens, and Chillicothe, Ohio. Such a two year covenant is not necessary to protect the legitimate interests of Holzer.

93. The protective covenant, in accordance with the Holzer Code of Regulations, only applied to those shareholders who left the Association, not those who were terminated.

94. The protective covenant does not apply to a physician, such as the plaintiff, who was wrongfully terminated as is alleged in this Complaint.

95. The termination was in violation of the Holzer Code of Regulations, which made the covenant unenforceable to plaintiff. Defendants terminated plaintiff without obtaining 2/3 votes of the shareholders in favor of termination, as they did not have proxies to terminate plaintiff, and without calling a meeting expressly for the purpose of discussing plaintiff's termination, as required by the Holzer Code of Regulations.

96. Furthermore, protective covenants that limit physicians are a particularly onerous form of restraint of trade, because of the need for qualified physicians, particularly critical care physicians and nephrologists.

97. Defendants, because of their conduct that has been alleged in paragraphs 88-96 have violated the Federal and Ohio Anti-trust laws (15 U.S.C. §1 and O.R.C., §§1331.01, *et seq.*).

### C. STATE WHISTLEBLOWER CLAIM

98. Defendants violated the Ohio State whistleblower statute, O.R.C. 4113.52.

99. Plaintiff believed that Swanson through his gross negligence was responsible for injury and death to patients of the Holzer Clinic and Holzer Medical Center, and this belief was supported by plaintiff's investigation into the circumstances surrounding bad outcomes that resulted from Swanson's work.

100. Plaintiff has provided oral and then written notification to defendants that Swanson was involved in criminal wrongdoing that was jeopardizing the health, safety, and welfare of Holzer's patients.

101. Defendants failed to correct the wrongdoing and did not make a reasonable attempt to do so, and, on the contrary, impeded plaintiff's attempts to prevent the wrongdoing from continuing.

102. Plaintiff then reported the wrongdoing to state and federal agencies that had regulatory authority over the health care industry.

103. Defendants harassed, required plaintiff to obtain psychological treatment, cancelled his malpractice insurance, and suspended and terminated him in retaliation for plaintiff's complaining to management personnel at the Holzer Clinic and Holzer Medical Center and to federal and state officials.

### D. STATE INTENTIONAL INTERFERENCE WITH BUSINESS, CONTRACTUAL, AND ECONOMIC RELATIONS CLAIM

104. Defendants have intentionally and improperly interfered with plaintiff's business, contractual, and economic relations by causing plaintiff's prospective employers not to enter into a business relationship with him when plaintiff sought employment after his termination.

### E. STATE DEFAMATION CLAIM

105. Defendants have defamed plaintiff by spreading false statements about plaintiff to persons in the community and by making false statements to plaintiff's prospective employers. Such statements have prevented plaintiff from obtaining employment and have severely injured his reputation.

### F. TERMINATION IN VIOLATION OF PUBLIC POLICY

106. Defendants, by engaging in the practices alleged above, have terminated plaintiff in violation of Ohio public policy.

### G. BREACH OF CONTRACT

107. The Code of Regulations of Holzer and Physicians' Administrative policy created contractual obligations on Holzer Clinic, Inc.

108. Defendants breached the agreement set forth in the Code of Regulations by

terminating plaintiff without having 2/3 of the shareholders vote in support of the termination, as required by the Code of Regulations of Holzer Clinic, Inc. Defendants obtained the proxy votes of more than 2/3 of the shareholders. However, Defendants did not obtain proxies to terminate the Plaintiff. Instead, the proxies were obtained to "be used at the bargaining table in discussions with Dr. Georgandellis.

109. Defendants also breached the agreement in the Code of Regulations by not terminating plaintiff without calling a meeting expressly to consider termination. Instead, the meeting was "held for the sole purpose of determining the shareholder/employment status of Dr. Lucas Georgandellis." Defendants violated the agreements set forth in the Code of Regulations, Article IX, Section One, by terminating the Plaintiff, although his professional and personal conduct were not incompatible with the Clinic's interests.

110. Defendants breached the Physician Administrative Policy by terminating plaintiff without following the five step process set forth in the Policy and although the Plaintiff had not committed five violations of Clinic Policy.

## V. PRAYER FOR RELIEF

WHEREFORE, the Plaintiff requests that he be reinstated to his positions with full privileges and benefits and that he be awarded back pay, front pay, prejudgment interest, compensatory and punitive damages, plus attorney's fees and costs. The Plaintiff also requests that this Court issue a preliminary injunction enjoining the Defendants from preventing the Plaintiff from practicing medicine within 30 miles of Holzer Medical Center and/or Holzer Clinic.

Respectfully submitted,

_____
Robert K. Handelman (0019589)
BARKAN NEFF HANDELMAN
MEIZLISH
360 South Grant Avenue
Columbus, Ohio 43215
(614) 221-4221 (phone)

_____
Alexander M. Spater (0031417)
360 South Grant Avenue
Columbus, Ohio 43215
(614) 222-4737 (phone)
(614) 222-4734 (fax)
Co-counsel for Plaintiff

## JURY DEMAND

Pursuant to Rule 38(B) of the Ohio Rules of Civil Procedure, the Plaintiff hereby demands a trial by jury in this action.

_____
Robert K. Handelman

20