# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

LUCAS GEORGANDELLIS, M.D.,     :
                                         :

    Plaintiff,                       :

                                         :   Case No. 2:08-cv-626

    v.                              :

                                       :   JUDGE ALGENON L. MARBLEY

HOLZER CLINIC, INC., ET AL.     :

                                       :   Magistrate Judge King

    Defendants.                    :

## OPINION & ORDER

## I. INTRODUCTION

This matter is before the Court on the Motion to Dismiss of Defendants Holzer Clinic Inc. ("Holzer Clinic"), T. Wayne Munro, M.D. ("Munro"), Jon M. Sullivan, M.D. ("Sullivan"), Michael Canady, M.D. ("Canady"), Robert E. Daniel ("Daniel"), and G. Patrick Connors ("Connors") (collectively, the "Clinic Defendants"); and the Motion for Judgment on the Pleadings of Defendants Holzer Medical Center, Inc. ("HMC"), James Phillippe ("Phillippe"), and Jamaal Haddad, D.O. ("Haddad") (collectively, the "HMC Defendants").

The Clinic Defendants move the Court to dismiss Plaintiff Lucas Georgandellis's ("Georgandellis") claims for: (1) violation of the False Claims Act ("FCA") Whistleblower Statute; (2) violation of state and federal anti-trust law; and (3) defamation. In addition, Munro, Sullivan, Canady, Daniel, and Connors (collectively, the "Individual Clinic Defendants") request the Court dismiss Georgandellis's claims for: (1) violation of the FCA Whistleblower Statute, to the extent the Court does not dismiss this claim for all Clinic Defendants; (2) violation of state and federal anti-trust laws, to the extent the Court does not dismiss this claim for all Clinic

Defendants; and (3) violation of the Ohio Whistleblower Statute.

For the reasons set forth below, the Court: (1) **DENIES** the Clinic Defendants' motion to dismiss the FCA claim; (2) **DENIES** the Clinic Defendants' motion to dismiss the state and federal anti-trust claims; and (3) **DENIES** the Clinic Defendants' motion to dismiss the defamation claim. The Court, however: (1) **GRANTS** the Individual Clinic Defendants' motion to dismiss the FCA claim; (2) **GRANTS** the Individual Clinic Defendants' motion to dismiss the state and federal anti-trust claims (these claims were brought only against Canady, Munro, and Sullivan); and (3) **GRANTS** the Individual Clinic Defendants' motion to dismiss the Ohio Whistleblower claim.

The HMC Defendants move the Court for an order granting judgment on the pleadings and dismissing Georgandellis's First Amended Complaint ("Amended Complaint"), which contains claims for: (1) violation of the FCA Whistleblower Statute; (2) violation of the Ohio Whistleblower Statute; (3) violation of state and federal anti-trust law; (4) defamation; (5) breach of contract; (6) declaratory judgment; and (7) tortious interference with business, contractual, and economic relations. In addition, to the extent the Court does not dismiss these claims for all HMC Defendants, Phillippe and Haddad (the "Individual HMC Defendants") move for judgment on the pleadings on all of Georgandellis's claims.

For the reasons set forth below, the Court: (1) **DENIES** the HMC Defendants' motion to dismiss the FCA claim; (2) **DENIES** the HMC Defendants' motion to dismiss the Ohio Whistleblower claim; (3) **DENIES** the HMC Defendants' motion to dismiss the state and federal anti-trust claims; (4) **DENIES** the HMC Defendants' motion to dismiss the defamation claim; (5) **GRANTS** the HMC Defendants' motion to dismiss the breach of contract claim; (6)

**GRANTS** the HMC Defendants' motion to dismiss the declaratory judgment claim; and (7) **DENIES** the HMC Defendants' motion to dismiss the tortious interference with business, contractual, and economic relations claim. Of the remaining claims against the Individual HMC Defendants, the Court: (1) **GRANTS** the Individual HMC Defendants' motion to dismiss the FCA claim; (2) **GRANTS** the Individual HMC Defendants' motion to dismiss the Ohio Whistleblower claim; (3) **GRANTS** the Individual HMC Defendants' motion to dismiss the state and federal anti-trust claims (these claims were brought only against Haddad); (4) **DENIES** the Individual HMC Defendants' motion to dismiss the defamation claim; and (5) **DENIES** the Individual HMC Defendants' motion to dismiss the tortious interference with business, contractual, and economic relations claim.

## II. BACKGROUND

### A. Factual Background

#### 1. The Parties

These facts are taken from the Amended Complaint. Georgandellis is a nephrology and critical care physician. He is a fellow of the American Society of Nephrology and fellow of the American College of Chest Physicians and was recertified in 2007 in Nephrology and Critical Care Medicine. He is a resident of Gallipolis, Ohio.

Holzer Clinic is a medical care provider with nine locations in Southeastern Ohio and Western West Virginia. Holzer Clinic currently consists of 98 physician shareholders and 33 salaried physicians. Georgandellis was a shareholder in the Holzer Clinic. HMC is a hospital located in Gallipolis, Ohio. Some physicians with privileges at HMC are shareholders at Holzer Clinic, and some physicians of the Holzer Clinic serve on committees at HMC.

Munro became the President of the Holzer Clinic in July 2005. Previously, he had been Vice President of the Holzer Clinic. He is a shareholder of the Holzer Clinic. Sullivan became Vice President of Medical Affairs at the Holzer Clinic in July 2005. He is a shareholder of the Holzer Clinic. Canady is a shareholder of the Holzer Clinic. He became Chief of Surgery of HMC in July 2005. Haddad is a shareholder of the Holzer Clinic. He became President of HMC Medical Staff in July 2005. Phillippe at all times relevant to this matter was the Chief Administrator of HMC. Daniels at all times relevant to this matter was an Administrator of the Holzer Clinic. Connors at all times relevant to this matter was an Associate Administrator of the Holzer Clinic.

## 2. Georgandellis's Employment

Georgandellis joined the Holzer Clinic in February 2003 as a salaried employee. At the time he was recruited, it was anticipated that he would expand the newly established dialysis unit at HMC. During his employment, the number of dialysis patients approximately quadrupled. At all times relevant to this matter, he had privileges at HMC (other than when he was suspended). He became a shareholder of the Holzer Clinic in April 2005. He was terminated from employment with the Holzer Clinic and terminated as a shareholder on January 23, 2008. Following this termination from the Holzer Clinic, his medical privileges were terminated with HMC.

## 3. Holzer Clinic Policies

The Code of Regulations of the Holzer Clinic sets forth the rights and obligations of shareholders of the Holzer Clinic, including termination and a protective covenant. Article XXI provides that "any individual who leaves the group causes substantial harm and damage to the

group" and therefore each shareholder is required to sign a protective covenant. The Holzer

Clinic required as a condition of Georgandellis's employment that he agree not to engage in the

practice of medicine for two years after the termination of his employment within 30 miles of the

Holzer Clinic's primary care facility in Gallipolis, Ohio and within 15 miles of any other facility

operated by the Holzer Clinic (the "Protective Covenant").

### 4. Georgandellis's Complaints Relating to Swanson's Surgeries

In 2004, the Holzer Clinic and the Medical Center established a joint program to perform

cardiothoracic surgery (hereinafter, the "Joint Cardiac Program"). Michael Swanson, D.O.

("Swanson") was hired by the Holzer Clinic in March 2005 to work with the Joint Cardiac

Program. According to Georgandellis, the President of the Medical Staff at HMC, Rebecca

Strafford, M.D. ("Strafford"), the Medical Credentials Committee of HMC, the Medical

Executive Committee of HMC, and HMC's Board of Trustees determined that Swanson did not

have a sufficient number of cardiothoracic cases in which he had functioned as the primary

surgeon. As a result, HMC required a second cardiothoracic surgeon to supervise Swanson's first

50 cardiothoracic operations.

On May 9, 2005, Swanson was scheduled to perform open heart/cardiothoracic

surgery on Rosalie Bush ("Bush"), a patient of HMC. According to Georgandellis, Swanson

performed that surgery without the requisite supervision. Bush died from the surgery.

Georgandellis, who was the Vice Chairman of the PEER Review and Quality Assurance

Committee of HMC and a member of the Holzer Clinic's Risk Management Committee, was

asked by Strafford in July 2005 to complete an internal investigation of Bush's surgery and to

determine whether there were errors and omissions on the part of the physicians and/or staff

involved. Georgandellis determined that Bush died because of the gross negligence of Swanson.

According to Georgandellis, Swanson, with the knowledge of the Defendants, continued to operate on patients without supervision and in a grossly negligent manner. Georgandellis asserts Swanson injured numerous patients. For instance, he asserts, Swanson injured a patient in September 2005 by inserting a chest tube into her stomach, resulting in fecal peritonitis. In addition, Georgandellis asserts, Swanson performed arteriovenous dialysis shunts and fistulas, even though he had never been trained in or performed the procedure.

Georgandellis repeatedly complained verbally and in writing to the Defendants from July 2005 until Swanson's departure in June 2007 about Swanson's gross negligence and the risks presented to patients, the Holzer Clinic, and HMC. Georgandellis asserts he warned Defendants Phillippe, Munro, Haddad, and Connors that it was fraud to bill Medicare for surgeries performed by an unqualified physician and that if they did not take the appropriate action, he would inform the Joint Commission on Accreditation ("JCAHO") and the police.

### 5. Alleged Retaliation

Georgandellis asserts that the Defendants began to retaliate against him, demanding that he cease his criticisms of Swanson as well as his criticisms of those responsible for allowing Swanson to operate without supervision. In October/November 2005, Haddad, the President of the Medical Staff of HMC, removed Georgandellis from the PEER Review and Quality Assurance Committee, and Munro, the President of the Holzer Clinic, removed Georgandellis from its Risk Management Committee.

Georgandellis asserts that the Defendants fabricated charges against him, accusing him of

being disruptive, having anger management problems, calling patients "fat," and having "poor" bedside manners. Georgandellis also asserts he was transferred to an office that lacked the knowledgeable personnel required to perform the complex work of Nephrology and Critical Care, substantially affecting his ability to care properly for his patients.

On April 6, 2006, Georgandellis was placed on administrative leave by the Holzer Clinic. He was told that if he did not agree to be admitted to the Kansas Professional Renewal Center for Psychological Counseling, he would be terminated. The Holzer Clinic also cancelled Georgandellis's medical malpractice insurance. HMC suspended his privileges due to cancellation of his medical malpractice insurance. Georgandellis asserts this prevented him from practicing medicine. After a five week evaluation, including intense psychiatric and psychological counseling, the Kansas Professional Renewal Center concluded that there was no basis to prevent Georgandellis from practicing medicine. As a result, he was removed from administrative leave and allowed to return to work.

In April 2007, the Plaintiff objected to Canady's reelection as Chief of Surgery of HMC because he allowed Swanson to operate without supervision. The Holzer Clinic fined Georgandellis $1,000 a month until "he apologized to Dr. Canady for stating that he had allowed the forging of Dr. Gulati's name in the operating room schedule."

Georgandellis then contacted the United States Center for Medicare and Medicaid ("CMS") and the Ohio Medical Board concerning fraudulent payments to HMC and the Holzer Clinic for the surgeries of Swanson. CMS relies on findings by JCAHO in determining whether health care facilities meet the requirements of CMS.

Georgandellis also asserts he told members of the Holzer Clinic Board on several

occasions about the "fraud" perpetrated on Medicare for the services rendered by Swanson, including Defendants Munro, Haddad, Daniels, and Sullivan. In addition, Georgandellis raised the issues of Medicare fraud and Swanson's incompetent care at a department of medicine meeting of HMC in October/November 2006 as well as at the July 2007 quarterly medical staff meeting. Finally, he raised the possibility of Medicare fraud with respect to billings submitted by the Holzer Clinic in May 2006 for work that was never performed.

The Holzer Clinic placed Georgandellis on administrative leave and suspended him for the second time in September 2007. Because his medical malpractice insurance was cancelled, he was once again not permitted to practice medicine at HMC. Georgandellis was required by the Holzer Clinic to undergo an additional psychological evaluation and counseling. It was again determined that he was fit to practice medicine.

### 6. Shareholders' Meetings and Termination

On November 1, 2007, the Holzer Clinic convened a special shareholder meeting to discuss Georgandellis's termination. The shareholders were specifically instructed not to discuss the Bush case, Canady's culpability, or Swanson's negligence and failed surgeries. In the course of the meeting, Georgandellis contends that he was falsely and maliciously accused by Sullivan of verbally abusing patients, euthanizing a patient, being the "worst physician" on the Holzer Clinic's staff, violating HIPAA, and having wrongfully accused Canady of committing fraud. The shareholders voted not to terminate Georgandellis, and he was permitted to return to work.

Notwithstanding the shareholders' decision, Georgandellis asserts that the Defendants continued to harass him and interfere with his medical practice. The Defendants demanded that he stop performing Quality Assurance work; he refused, however, because as the Nephrology

Dialysis Director, he was required by federal law to provide that oversight.

On December 31, 2007, Holzer Clinic placed Georgandellis on a third unpaid suspension and his medical malpractice insurance was suspended. Due to this, he was also prohibited from practicing medicine at HMC. He was told in a letter that he was placed on unpaid suspension in part because he discussed Swanson's handling of the Bush case after he had "been repeatedly instructed not to do so" and because he was "reported to say that [he] will be suing the Administration and the Clinic."

On January 16, 2008, Georgandellis appeared before the Holzer Clinic's Medical Board to appeal his suspension. At the meeting, Georgandellis informed the Board that he had notified JCAHO and the State Medical Board of the infractions involving Swanson. He also advised the Board that billing for Swanson's uncredentialed work contravened the FCA and constituted Medicare fraud.

On January 23, 2008, a shareholders' meeting was called. Georgandellis alleges that Defendants failed to inform the shareholders that the true purpose of the meeting was to terminate Georgandellis. At the meeting, Sullivan and Munro, repeated the same negative representations about Georgandellis as previously offered at the earlier shareholders' meeting on November 1, 2006 and included additional allegations concerning his conduct. At the conclusion of the meeting, Georgandellis was terminated.

### 7. Post-Termination

Following his termination, Georgandellis asserts that the Defendants told prospective employers that Georgandellis was abusive towards patients, called patients names, and did not treat patients with respect, preventing Georgandellis from securing employment. He specifically

alleges that Defendants made false and malicious allegations to officials of the Pleasant Valley Hospital, where the Plaintiff was applying for a position,  in February and/or March 2008 and to several medical staffing agencies and potential employers. Georgandellis asserts he has been informed by potential employers that, as the result of circumstances of his separation from the Holzer Clinic and his multiple suspensions of privileges from HMC, employers would be extremely reluctant to offer him a position. Georgandellis asserts that as a result of Defendants conduct, he has suffered a loss of employment, the ability to practice medicine in the community of his choice, loss of income, loss of reputation, embarrassment, and severe emotional and mental distress.

## B. Procedural Background

On January 23, 2008, Georgandellis was involuntarily separated from the Holzer Clinic after the Holzer Clinic received the required two-thirds majority shareholder vote. On June 27, 2008, Georgandellis filed a Complaint against the Clinic Defendants and HMC Defendants.  On September 11, 2008, Georgandellis filed an Amended Complaint.

The Amended Complaint alleges seven causes of action: (1) violation of the FCA Whistleblower Statute; (2) violation of federal and state anti-trust laws; (3) violation of Ohio's Whistleblower Statute; (4) defamation; (5) breach of contract; (6) declaratory judgment; and (7) intentional interference with business, contractual, and economic relations. The Clinic Defendants have moved to dismiss some of the claims. The HMC Defendants have moved for judgment on the pleadings for the entire Amended Complaint.

## III. STANDARD OF REVIEW

The Clinic Defendants' Motion to Dismiss is brought pursuant to Fed. R. Civ. P.

12(b)(6). A case may be dismissed if the complaint does not state a claim on which relief can be granted. Fed. R. Civ. P. 12(b)(6). A "motion to dismiss for failure to state a claim is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations." *Golden v. City of Columbus*, 404 F.3d 950, 958-59 (6th Cir. 2005). Consequently, the Court must construe the complaint in the light most favorable to the non-moving party, accept all factual allegations as true, and make reasonable inferences in favor of the non-moving party. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 553 F.3d 430, 434 (6th Cir. 2008); *Murphy v. Sofamor Danek Group, Inc.*, 123 F.3d 394, 400 (6th Cir. 1997). A court will grant a motion to dismiss under Rule 12(b)(6) only if there is an absence of law to support a claim of the type made or of facts sufficient to make a valid claim, or if on the face of the complaint there is an insurmountable bar to relief indicating that the plaintiff does not have a claim. *Cmty. Mental Health Serv. v. Mental Health & Recovery Bd.,* 395 F. Supp. 2d 644, 649 (S.D. Ohio 2004).

Although liberal, this standard requires more than the bare assertion of legal conclusions. *Allard v. Weitzman*, 991 F.2d 1236, 1240 (6th Cir. 1993). Under the federal pleading requirements, a plaintiff's complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2). The complaint must "give the defendant fair notice of what the claim is, and the grounds upon which it rests." *Nader v. Blackwell*, 545 F.3d 459, 470 (6th Cir. 2008) (quoting *Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197, 2200 (2007) (internal quotations omitted)). While a complaint need not contain "detailed factual allegations," its "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true."

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964 (2007).

The HMC Defendants' Motion for Judgment on the Pleadings is brought pursuant to Fed.

R. Civ. P. 12(c). A motion for judgment on the pleadings under Fed.R.Civ.P. 12(c) is reviewed

under the same standard applicable to a motion to dismiss under Rule 12(b)(6). *Ziegler v. IBP*

*Hog Mkt.*, 249 F.3d 509, 511-12 (6th Cir. 2001).

## IV. LAW AND ANALYSIS

### A. Violation of the False Claims Act Whistleblower Provision

The False Claims Act ("FCA") makes it unlawful for any person to "knowingly present[],

or cause[] to be presented, to an officer or employee of the United States Government . . . a false

or fraudulent claim for payment or approval" or to "knowingly make[], use[], or cause[] to be

made or used, a false record or statement to get a false or fraudulent claim paid or approved by

the Government." 31 U.S.C. § 3729(a)(1), (2). Georgandellis alleges that Defendants violated the

FCA by engaging in Medicare fraud[1] and seeks protection under Section 3730(h) of the

FCA—the "whistleblower" provision, which states, in relevant part:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in
> any other manner discriminated against in the terms and conditions of
> employment by his or her employer because of lawful acts done by the employee
> on behalf of the employee or others in furtherance of an action under this section,
> including investigation for, initiation of, testimony for, or assistance in an action
> filed or to be filed under this section, shall be entitled to all relief necessary to
> make the employee whole.

Georgandellis asserts that the Defendants harassed him, requiring him to obtain psychological

treatment, and subsequently unjustly suspended and terminated him because he acted in

---

[1]Georgandellis alleges that Defendants engaged in Medicare fraud by billing Medicare
"for surgeries performed by an unqualified physician."

furtherance of the FCA.

Section 3730(h) only protects "whistleblowers' who pursue or investigate or otherwise contribute to a qui tam action, exposing fraud against the United States government." *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 513 (6th Cir. 2000).[2] To establish that he was retaliated against in violation of Section 3730(h), an alleged whistleblower must prove: (1) he was engaged in a protected activity; (2) the employer knew about the protected activity; and (3) the employer must have discharged or otherwise discriminated against the alleged whistleblower as a result of the protected activity. *Id.* at 514 (citing *United States ex. Rel. McKenzie v. BellSouth Telecomms. Inc.*, 123 F.3d 935, 944 (6th Cir. 1997)). Therefore, to be liable, the defendant must have been the plaintiff's employer. *Nguyen v. City of Cleveland*, 121 F.Supp.2d 643, 648 (N.D.Ohio 2000).

The motion to dismiss of the Individual Clinic Defendants (Munro, Sullivan, Canady, Daniel, and Connors) and the Individual HMC Defendants (Phillippe and Haddad) is thereby **GRANTED** because the Individual Defendants were never Georgandellis's employer.

### 1. HMC: HMC was not Georgandellis's Employer; No Retaliation as a Matter of Law

HMC asserts that Georgandellis's FCA claim against HMC must be dismissed because he has not alleged sufficient facts to show that HMC was his employer. HMC also asserts that HMC did not terminate Georgandellis's employment. As a result, HMC contends, there can be no retaliation as a matter of law.

---

[2]A "qui tam action" is one brought by an individual on behalf of himself as well as the government. "[W]hen filing any qui tam suit, a relator is suing 'in the name of the government.'" *Rowlands v. Pointe Mouille Shooting Club*, No. 98-1514, 1999 WL 520110, at *3 (6th Cir. July 14, 1999) (quoting 31 U.S.C. § 3130(b)).

First, this Court will address HMC's second argument. Section 3730(h) provides relief for employees who are discriminated against in the terms and conditions of employment. It does not only provide relief for employees who are discharged. Therefore, even if HMC did not terminate Georgandellis's employment, Georgandellis has asserted that HMC discriminated against him in other ways. This is sufficient to maintain a Section 3730(h) claim, provided HMC was his employer.

Second, this Court will address HMC's first argument, that HMC was not Georgandellis's employer. The term "employer" is not defined within the FCA. It is apparent from the statute, however, that the defendant, to be liable, must have had an employment relationship with the plaintiff to be liable. *Nguyen*, 121 F.Supp.2d at 648. In *Nguyen*, the Court recognized that § 3730(h) permits suits against an employer even if it did not employ the plaintiff at the time he took action protected by the FCA. *Id.* Nevertheless, it is still required that the defendant have been, at least at some point in time, an employer of the plaintiff. *See U.S. ex rel. Sarafoglou v. Weill Med. Coll. of Cornell Univ.*, 451 F.Supp.2d 613, 625 (S.D. N.Y. 2006) ("only employers can incur liability under § 3730(h)"); *U.S. ex rel. Chandler v. The Hektoen Inst. for Med. Research*, 35 F.Supp.2d 1078, 1087 (N.D. Ill. 1999) (the language of § 3730(h) "reflects a legislative intent to operate exclusively in the area of the 'employment relationship.'").[3]

When Congress uses the term "employer" in § 3730(h) without defining it, it is intended "employer" have "its ordinary, common law meaning." *U.S. ex rel. Siewick. v. Jamieson Science*

---

[3]Section 3730(h) liability also cannot be extended to non-employers on the basis of a conspiracy. *Chandler*, 35 F.Supp.2d at 1087.

*and Eng'g, Inc.*, 322 F.3d 738, 740 (D.C. Cir. 2003); *see Cmty. for Creative Non-Violence v.*

*Reid*, 490 U.S. 730, 739-740 (1989) (when Congress uses the term "employee" or "employer" in

a statute without defining it, "Congress intended to describe the conventional master-servant

relationship as understood by common-law agency doctrine").[4]

> At common law the relevant factors defining the master-servant relationship focus on the master's control over the servant. The general definition of the term "servant" in the Restatement (Second) of Agency § 2(2) (1957), for example, refers to a person whose work is "controlled or is subject to the right to control by the master." *See also id.*, § 220(1) ("A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control"). In addition, the Restatement's more specific definition of the term "servant" lists factors to be considered when distinguishing between servants and independent contractors, the first of which is "the extent of control" that one may exercise over the details of the work of the other. *Id.*, § 220(2)(a). We think that the common-law element of control is the principal guidepost that should be followed in this case.

*Clackamas Gastroenterology Assocs., P. C. v. Wells*, 538 U.S. 440, 448 (2003).[5]

---

[4]Georgandellis argues that the definition of "employer" under the FCA should be "all-inclusive" because the Senate Report states, "[a]s the rule under other Federal Whistleblower statues as well as discrimination laws, the definitions of 'employee' and 'employer' should be all-inclusive." (Response to HMC p. 3).This Court finds, however, that "the Report signified only that both public and private entities should be considered employers under § 3730(h)." *Siewick*, 322 F.3d at 740. Georgandellis has cited nothing suggesting that the term "employer" as used in other whistleblower statutes means something different than what it meant at common law, and the precedents are to the contrary. *Id., citing see, e.g., Coupar v. U.S. Dep't of Labor*, 105 F.3d 1263, 1266-67 (9th Cir. 1997); *Gary v. Long*, 59 F.3d 1391, 1395, 1399 (D.C. Cir. 1995); *Birbeck v. Marvel Lighting Corp.*, 30 F.3d 507 (4th Cir. 1994).

[5]Georgandellis asserts the Court should treat HMC and Holzer Clinic as a "joint" or "single" employer pursuant to *Armbruster v. Quinn*, 711 F.2d 1332 (6th Cir. 1983). In that case, the Court found that if there is "sufficient indicia of an interrelationship between the immediate corporate employer and the affiliated corporation," the affiliated corporation may be jointly responsible for the acts of the immediate employer. *Id.* at 1337. That case, however, dealt with when a parent corporation is responsible for a subsidiary's Title VII violations. *Id.* There have been no facts alleged in this case indicating that HMC is the parent corporation of Holzer Clinic. As such, the Court does not find that case to be applicable. Furthermore, the showing required to

At this stage of the pleadings, the Court must take Georgandellis's allegations as true.

Georgandellis has alleged:

> "The Medical Center exercised substantial supervisory control over the Plaintiff, including his professional practice." (Am. Comp. ¶ 5).

> That during his employment he "expand[ed] the newly established dialysis unit at the Medical Center . . . quadrupling the number of dialysis patients." (*Id.* ¶ 15).

> He was "asked by . . . the President of the Medical Staff of the Medical Center . . . to complete an internal investigation . . ." (*Id.* ¶ 34).

> "Members of the Medical Center staff . . . began to closely supervise the Plaintiff including routinely questioning the services provided to patients, his medical decision-making, and his interaction with patients." (*Id.* ¶ 69).

> "The Medical Center, as well as the Clinic . . . control the manner and means by which physicians of the Clinic, including the Plaintiff, have provided medical care to patients." (*Id.* ¶ 98).

> "Plaintiff's dialysis practice was in the Medical Center, and the Medical Center had control over the location of offices. Plaintiff's surgeries, procedures, and dialysis treatments were conducted only at the Medical Center, and the Medical Center controlled when his treatments and surgeries would occur. The nurses and others who assisted the Plaintiff in his work were the employees of and controlled by the Medical Center." (*Id.* ¶ 100).

> "The Chief of Surgery and Chief of Medicine of the Medical Center and other agents of the Medical Center monitored Plaintiff's work, told the Plaintiff when he should work at the Medical Center, when patients should be discharged from the Medical Center . . ." (*Id.* ¶ 101).

> "The Clinic and the Medical Center were involved in the decisions to require the Plaintiff to obtain psychological counseling, to suspend him, and to terminate him." (*Id.* ¶ 103).

Construing the Amended Complaint in the light most favorable to Georgandellis,

---

warrant a finding of single-employer status has been described as "highly integrated with respect to ownership and operations." *Id.* at 1338. This was not sufficiently alleged in the Amended Complaint.

accepting all factual allegations as true, and making reasonable inferences in favor of

Georgandellis, he has alleged HMC exercised sufficient control over him that the Court can

reasonably infer HMC was his employer. This is sufficient to survive HMC's motion to dismiss.

**2. Holzer Clinic and HMC: Georgandellis Failed to Allege Protected Activity**

The Holzer Clinic and HMC both assert that Georgandellis failed to allege the first prong

that an alleged whistleblower must prove under § 3730(h): that he engaged in a protected

activity. "Protected activity" should be interpreted broadly. *U.S. ex rel. McKenzie v. Bellsouth*

*Telecomms., Inc.*, 123 F.3d 935, 944 (6th Cir. 1997) (citing *see* S. Rep. No. 345, 99th Cong., 2d

Sess. 34 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5300). The Sixth Circuit has interpreted

"protected activity" to mean "acts done . . . in furtherance of . . . an action filed or to be filed

under [§ 3730(h)]." *McKenzie*, 219 F.3d at 515. The Sixth Circuit found the "in furtherance of"

language to require the plaintiff to be "investigating matters that reasonably could lead to a

viable False Claims Act case." *Id.*

A qui tam action under § 3729 may be dismissed because elements of that claim are not

established; a retaliation claim under § 3730(h), however, may still survive if the employee

adequately alleges his employer was aware he was contemplating pursuing a qui tam action

under the FCA. *McKenzie*, 123 F.3d at 944-45. In *McKenzie*, the Court dismissed the plaintiff's

qui tam action, but the Court found her retaliation claim survived dismissal. *Id.* at 945.

Retaliation claims under § 3730(h) are not dependent on a plaintiff's ability to succeed on, or

even file, a cause of action under § 3729. *U.S. ex rel. v. Satalich v. City of Los Angeles*, 160

F.Supp.2d 1092, 1108 (C.D. Cal. 2001); *see also United States ex rel. v. Howard Univ.*, 153 F.3d

731, 739 (D.C. Cir. 1998) ("the protected conduct element of [a § 3730(h)] claim does not

require the plaintiff to have developed a winning qui tam action before he is retaliated against");

*United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1522 (10th Cir.

1996) ("[t]he case law is clear that a retaliation claim can be maintained even if no FCA action is

ultimately successful or even filed").

The case sub judice is similar to the case of *United States ex rel. Smith v. Yale Univ.*, 415

F.Supp.2d 58 (D. Conn. 2006). In that case, one of the allegations to support the § 3729 qui tam

action was that plaintiff's employer billed for studies by radiologists who were not qualified

physicians. *Id.* at 92. The court held that the qui tam action should be dismissed for failure to

state a claim because the plaintiff failed to provide support for or explain her assertion that

Medicare would not provide reimbursement for services performed by "non-qualified"

physicians. *Id.* at 93. The Court held, "[a]s the Regulations provide no basis for distinguishing

between 'qualified' and 'non-qualified' physicians, a claim that one or more are unqualified does

not give rise to a viable cause of action." *Id.* Nevertheless, though the plaintiff's qui tam action

under § 3729 failed in *Yale*, that did not necessitate the failure of her retaliation claim under §

3730. *Id.* at 104. The court found that the first prong of the § 3730(h) inquiry---that the plaintiff

engaged in protected activity---was satisfied in that case because the plaintiff alleged he was

investigating and reporting defendant's alleged fraudulent billing practices. *Id.*

In the current case, Georgandellis alleges that while practicing medicine at HMC, he

became aware that Swanson was permitted to perform surgeries without supervision that he was

not credentialed or qualified to perform. (Am. Comp. ¶¶ 21-23, 26, 29, 44). Georgandellis

"warned Defendants Phillippe, Munro, Haddad, and Connors that it was fraud to bill Medicare

for surgeries performed by an unqualified physician and that if they didn't take the appropriate

action, he would inform JCAHO and the police." (*Id.* ¶ 47). Georgandellis asserts he "continued

to complain to the Defendants about . . . continued Medicare fraud involved in billing for Dr.

Swanson's patients." (*Id.* ¶ 54). Furthermore, because of Defendant's failure to act,

Georgandellis "contacted the United States Center for Medicare and Medicaid . . . and the Ohio

Medical Board concerning fraudulent payments to the Medical Center and the Clinic for the

surgeries of Dr. Swanson." (*Id.* ¶ 61).

> Georgandellis also alleges that he,
>
> told members of the Clinic Board on several occasions about the 'fraud'
> perpetrated on Medicare for the services rendered by Dr. Swanson, including
> Defendants Wayne Munro, Jamaal Haddad, Robert Daniels, and Jon Sullivan.
> Georgandellis also raised the issues of Medicare fraud and Dr. Swanson's
> incompetent care at a department of medicine meeting of the Medical Center
> October/November 2006 as well as the July 2007 quarterly medical staff meeting.

(*Id.* ¶ 63). He "also raised the possibility of Medicare fraud with respect to billings submitted by

the Clinic in May 2006 for work that was never performed." (Id. ¶ 64). Finally, during a meeting

on January 16, 2008, he advised Defendants "that billing for Dr. Swanson's uncredentialed work

contravened the False Claims Act and constituted Medicare fraud." (*Id.* ¶ 83).

Georgandellis has alleged protected activity in furtherance of the FCA through his

reporting to officials at the Holzer Clinic and HMC about purported Medicare fraud. He has also

alleged protected activity through his contacting the United States Center for Medicare and

Medicaid and the Ohio Medical Board concerning Medicare fraud. Although under the authority

of *Smith* there is no support for the claim that Medicare would not provide reimbursement for

services performed by "non-qualified" physicians, such that a qui tam action is not viable, *see*

415 F.Supp.2d at 93, that does not, however, impact the viability of a retaliation claim if Holzer

Clinic and HMC retaliated against Georgandellis for engaging in protected activity in

furtherance of the FCA.

### a. Duty to Investigate and Report

The Holzer Clinic and HMC also assert that because Georgandellis was assigned investigatory duties as part of the PEER Review and Quality Assurance Investigation Committee, this triggers a heightened standard he must meet to establish protected activity. "Where an employee's job duties involve investigation and reporting fraud, the employee's burden of proving he engaged in 'protected conduct' and put his employer on notice of the 'distinct possibility' of False Claim Act litigation is heightened." *U.S. ex rel Hefner v. Hackensack Univ. Med. Ctr.*, No. Civ. A. 01CV4078DMC, at * 12 (D. N.J. Dec. 23, 2005). In such a case, the plaintiff must "overcome the presumption that he was merely acting in accordance with his employment obligations when he discovered the billing discrepancies, as opposed to investigating on his own accord the possibility of false claims being filed." *Id.* (citing *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 567-68 (6th Cir. 2003)).

In this case, Georgandellis asserts his job on the committee was not to investigate and report fraud. Rather, his assignment was "to complete an internal investigation . . . of Mrs. Bush's surgery and to determine whether there were errors and omissions on the part of the physicians and/or staff involved." (Am. Comp. ¶ 34). In other words, he asserts his job was to review the event of Bush's death and determine whether Swanson's services met the applicable standard. As such, he claims that when he reported that Defendants were committing Medicare fraud, and later reported that they might have violated the FCA, Defendants had to understand that he was not acting in his role as a member of the committee and that he was contemplating an FCA action.

Furthermore, Georgandellis was only assigned to review Swanson's work on one case, and only for a short period of time. (*Id.* at ¶ 49). Many of Georgandellis's complaints occurred when he was no longer part of the committee. By that time, Defendants cannot conceivably claim that they thought Georgandellis was acting in his capacity as a member of the committee. Indeed, he had been removed from the committee for two years when he complained in 2007 about Medicare fraud perpetrated against the federal government.

### 3. Holzer Clinic and HMC: Georgandellis Failed to Allege Knowledge of Protected Activity

The Holzer Clinic and HMC both assert that the allegations in Georgandellis's Amended Complaint do not allege that they knew that he was contemplating taking action under the FCA. Georgandellis asserts he "warned Defendants Phillippe, Munro, Haddad, and Connors that it was fraud to bill Medicare for surgeries performed by an unqualified physician and that if they didn't take the appropriate action, he would inform JCAHO and the police"; that he "continued to complain to the Defendants about . . . continued Medicare fraud involved in billing for Dr. Swanson's patients"; that he, "told members of the Clinic Board on several occasions about the 'fraud' perpetrated on Medicare for the services rendered by Dr. Swanson, including Defendants Wayne Munro, Jamaal Haddad, Robert Daniels, and Jon Sullivan"; that he "raised the issues of Medicare fraud and Dr. Swanson's incompetent care at a department of medicine meeting of the Medical Center October/November 2006 as well as the July 2007 quarterly medical staff meeting"; that he "raised the possibility of Medicare fraud with respect to billings submitted by the Clinic in May 2006 for work that was never performed"; and that during a meeting on January 16, 2008, he advised Defendants "that billing for Dr. Swanson's uncredentialed work contravened the False Claims Act and constituted Medicare fraud." (*Id.* ¶¶ 47, 54, 63, 64, and

83).

Based on Georgandellis's multiple and repeated reports to Defendants that they were defrauding the United States government by billing for Swanson's "worthless services," the Holzer Clinic and HMC should have known that he was at least contemplating pursuing an FCA case.

### 4. Holzer Clinic and HMC: Georgandellis Failed to Allege Facts that Support He was Terminated on Account of Protected Activity

The Holzer Clinic and HMC both assert that Georgandellis has not alleged any facts showing a connection between his termination and retaliation for taking action under the FCA. Section 3730(h) provides relief for employees who are discriminated against in the terms and conditions of employment. It does not only provide relief for employees who are discharged. Georgandellis has asserted that Defendants retaliated against him in other ways than termination. Namely, he has asserted they removed him from two different committees and "fabricated charges against the Plaintiff, accusing him of being disruptive, having anger management problems, calling patients 'fat,' and having 'poor' bedside manners." (Amend. Comp. ¶¶ 49-50). He asserted he was transferred to an office that lacked knowledgeable personnel that could assist him in his work. (*Id.* at 51). He also asserted he was placed on administrative leave, his medical malpractice insurance was cancelled, HMC suspended his privileges, and he was forced to submit himself to psychiatric and psychological counseling. (*Id.* ¶¶ 52-53). He alleges this all occurred in retaliation for his criticisms of Swanson, and his refusal to succumb to Defendants' demands that he cease his criticisms. (*Id.* ¶ 48). He ultimately alleges he was terminated due to false accusations made in retaliation for his complaints. (*Id.* ¶¶ 48, 50 74, 87, 90). Georgandellis alleges that all of these actions, including his termination, occurred because he acted in

furtherance of the FCA. (*Id.* ¶ 97). The facts alleged support that Georgandellis was terminated on account of his protected activity.

Because Georgandellis has alleged facts sufficient to support all the elements of a § 3730(h) claim, the Holzer Clinic's and HMC's motions to dismiss the FCA claim are **DENIED**.

## B. Violation of the Ohio Whistleblower Statute

Georgandellis asserts that Defendants violated the Ohio Whistleblower Statute, Ohio Rev. Code § 4113.52. That statute states, in relevant part:

> (A)(1)(a) If an employee becomes aware in the course of the employee's employment of a violation of any state or federal statute or any ordinance or regulation . . . that the employee's employer has authority to correct, and the employee reasonably believes that the violation is a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety . . . , the employee orally shall notify the employee's supervisor or other responsible officer of the employee's employer of the violation and subsequently shall file with that supervisor or officer a written report that provides sufficient detail to identify and describe the violation.
>
> (B) Except as otherwise provided in division (C) of this section, no employer shall take any disciplinary or retaliatory action against an employee for making any report authorized by division (A)(1) or (2) of this section, or as a result of the employee's having made any inquiry or taken any other action to ensure the accuracy of any information reported under either such division.

Defendants argue that the Individual Defendants are not Georgandellis's employer, and therefore cannot be liable under the statute. Georgandellis does not contest this.[6] To the extent that this is a claim against the Individual Defendants, their motion to dismiss this claim is

---

[6]Georgandellis acknowledges in footnote 2 of his Response to HMC's Motion to Dismiss that he "is not claiming that the employees or agents of HMC are 'employers' under O.R.C. § 4113.52." (p. 13).

**GRANTED** because they are not Georgandellis's employer.[7]  For Defendants HMC and the

Holzer Clinic, as discussed above, Georgandellis  sufficiently alleged that they were both his

employers.

HMC, however, contends that Georgandellis has not established a claim under § 4113.52

because he does not allege when he provided oral notice or the date he provided written notice of

the alleged violations. HMC also contends that Georgandellis does not indicate what specific

conduct he reported and fails to attach a copy of the written notification to his Amended

Complaint.

Georgandellis alleges in his Amended Complaint that he "provided oral and then written

notification to Defendants Holzer Clinic and Medical Center that Dr. Swanson was involved in

acts that were jeopardizing the health, safety, and welfare of Holzer's patients." (*Id.* ¶ 118). Such

an allegation satisfies Fed. R. Civ. P. 8(a)(2) which requires only "a short and plain statement of

the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice

of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema

N.A.*, 534 U.S. 506, 507 (2002). There is no requirement that Georgandellis allege when he

provided notice or other specifics of what was provided in the notice, and there is no requirement

he attach a copy of the written notification.

The Holzer Clinic also contends that it is entitled to judgment on the pleadings on this

---

[7]The statute defines "employer" as "any person who has one or more employees."
'Employer' includes an agent of an employer, the state or any agency or instrumentality of the
state, and any municipal corporation, county, township, school district or other political
subdivision or any agency or instrumentality thereof." Ohio Rev. Code § 4113.51(B). Based
upon this definition of employer, individuals cannot be held liable for alleged violations of Ohio
Rev. Code § 4113.52. *See Armstrong v. Trans-Serv. Logistics, Inc.*, No. 04CA015,  2005 WL
1301691, at *6 (Ohio Ct. App. May 27, 2005).

claim because Georgandellis was not an at-will employee. The Holzer Clinic asserts that the judicially created public policy exception to the employment at-will doctrine is not available to those individuals who are not, in fact, at-will employees. *See Haynes v. Zoological Soc'y*, 652 N.E.2d 948, 951 (Ohio 1995) (finding that wrongful termination in violation of public policy is an exception to the employment at-will doctrine and, therefore, unavailable to union members who are not employees at-will). The problem with the Holzer Clinic's argument is that Georgandellis has brought his claim under Ohio Rev. Code § 4113.52. There is no requirement under this statutory provision that an employee be employed at-will.

For the foregoing reasons, the motions to dismiss the claims against HMC and the Holzer Clinic for violation of the Ohio Whistleblower Statute are **DENIED**.

### C. Violation of Federal and State Anti-Trust Claims

### 1. HMC, Canady, Munro, Sullivan, and Haddad

Georgandellis alleges that Defendants violated 15 U.S.C.A. §§ 1 and 2 and Ohio Rev. Code § 1331.01, et seq. Section 1 states:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. . . .

Section 2 states:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . .

Georgandellis asserts that the Holzer Clinic, HMC, Canady, Munro, Sullivan, and Haddad conspired,

> [t]o bring about the termination of the Plaintiff and enforcement of the Protective

Covenant to prevent the Plaintiff from practicing as a nephrology and critical care physician within 30 miles of the Clinic's primary care facility in Gallipolis and within 15 miles of any other facility operated by the Clinic. This conduct by Defendants constituted intentional and unreasonable restraints of trade.

(Am. Comp. ¶ 108).

Defendants contend that Georgandellis's claims for anti-trust violations must be dismissed because: (1) he has failed to allege any facts showing that he suffered an anti-trust injury; and (2) he cannot establish the requisite "conspiracy" to establish an anti-trust claim. In addition, Defendants Canady, Munro, Sullivan, and Haddad assert the claims must be dismissed as to the Individual Defendants because Georgandellis has failed to specify how each Individual Defendant allegedly violated anti-trust laws.

## 1. Anti-Trust Injury

Case law has established that a plaintiff asserting a federal antitrust violation must prove "antitrust injury." *Indeck Energy Serv., Inc. v. Consumers Energy Co.*, 250 F.3d 972, 976 (6th Cir. 2000). An antitrust injury is defined as an injury of the type which the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). As the Supreme Court further explained in *Brunswick*, "[t]he injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations . . . would be likely to cause'" *Id.* (citing *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100 (1969)). The presence of an antitrust injury is essential because "[o]therwise, routine disputes between business competitors would be elevated to the status of an antitrust action, thereby trivializing the Act because of its too ready availability." *Indeck Energy Serv.*, 250 F.3d at 976.

Georgandellis alleged that the Protective Covenant is "an unreasonable restraint of competition"; that residents of this area are "significant under served by both nephrologists and critical care physicians"; that enforcement of the Protective Covenant would "prevent the Plaintiff from practicing as a nephrology and critical care physician within 30 miles of the Clinic's primary care facility in Gallipolis and within 15 miles of any other facility operated by the Clinic"; that enforcement of the Protective Covenant has "prevented and will continue to prevent people in that area from obtaining the services of a highly qualified nephrology and critical care physician"; and that there is "presently no nephrology and critical care physician servicing that area of the Ohio Valley on a full-time basis and, therefore, the lives and health and safety of residents in the area have been jeopardized." (Am. Comp. ¶¶ 105-09). Georgandellis also asserts that the enforcement of the Protective Covenant has prevented him from working in hospitals in Charleston and Huntington, West Virginia, and Ashland, Kentucky, as well as Jackson, Athens, Chillicothe, and Gallipolis, Ohio. (*Id.* ¶ 110).

These allegations assert a market-wide injury to residents in the Ohio Valley area because this area is allegedly underserved by nephrologists and critical care physicians. The allegations also delineate a competition reducing effect of Defendants' behavior, which is that Georgandellis will be unable to compete with the Holzer Clinic and that there is no other full-time nephrologist and critical care physician servicing that area that can compete with the Holzer Clinic. As the Amended Complaint asserts that residents of the Ohio Valley area are unable to find alternatives to the Holzer Clinic for their nephrology needs, and that Georgandellis himself is incapable of competing in the relevant market, Georgandellis has sufficiently alleged an injury to survive a motion to dismiss. *But see Gentile v. Fifth Avenue Otolaryngology, Inc.*, No. 4:05

CV 2936, 2006 WL 2505915, at * 6 (N.D. Ohio Aug. 28, 2006) (the complaint failed to allege that patients were unable to find alternatives to the defendants for their medical needs, and failed to allege that the plaintiff himself was incapable of competing in the relevant market).[8]

## 2. Conspiracy

Under Chapter 15 U.S.C.A., "[a] necessary element of establishing a § 1 violation is proof of conspiracy or concerted activity. Section 1 does not reach a unilateral contract; only § 2 governs conduct by a single actor." *Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568, 572 (6th Cir. 1988). Georgandellis asserts that the Holzer Clinic engaged in a conspiracy with HMC and Defendants Canady, Munro, Sullivan, and Hadded to bring about the termination of Georgandellis and enforcement of the Protective Covenant. (Am. Comp. ¶ 108).

It is well settled that "officers or employees of the same firm do not provide the plurality of actors imperative for a § 1 conspiracy." *Potters*, 800 F.3d at 573; *see Smith v. N. Michigan Hosp., Inc.*, 703 F.2d 942, 950 (6th Cir. 1983) ("[t]wo or more individual officers, directors or agents within a corporation, acting on behalf of that corporation, are considered incapable of conspiring with each other or with their corporation, for § 1 purposes"). The rationale underlying the rule is that those persons "share a unity of economic purpose with the firm, so that agreements, combinations or concerted actions among them do not impermissibly coalesce economic power that was previously directed toward divergent goals." *Potters*, 800 F.3d at 573.

---

[8]This Court notes that the adequacy of a physician's contentions regarding the effect on competition is typically resolved after discovery, either on summary judgment or at trial. *Brader v. Allegheny General Hosp.,* 64 F.3d 869, 876 (3d Cir. 1995) (citing *see Lie v. St. Joseph Hosp.*, 964 F.2d 567, 570 (6th Cir. 1992)) (affirming summary judgment where physician failed to show "an injury to competition in the form of increased cost or reduced supply of services or harm to the consumer"). Furthermore, the existence of an "antitrust injury" is not typically resolved through motions to dismiss. *Id.*

To find liability for individual actors within a corporation, a court would have to find the "independent personal stake" exception to the traditional rule that a corporation cannot conspire with its officers or agents applies. *Smith*, 703 F.2d at 950. Under this exception, a conspiracy may exist between a corporation and its employee or between two employees "by virtue of the employee's independent personal stake in achieving the object of the conspiracy." *Id.*

Canady and Haddad are shareholders of the Holzer Clinic.[9] Munro is a shareholder of the Holzer Clinic and President of the Holzer Clinic. Sullivan is a shareholder of the Holzer Clinic and Vice President of Medical Affairs at the Holzer Clinic. Because Canady, Haddad, Munroe and Sullivan are shareholders of the Holzer Clinic, and Munro and Sullivan are employees/officers of the Holzer Clinic, they "share a unity of economic purpose with the firm, so that agreements, combinations or concerted actions among them do not impermissibly coalesce economic power." *See Potters*, 800 F.3d at 573. The "independent personal stake" exception does not apply because Georgandellis has not alleged any independent personal stake in restraining trade or commerce of the Individual Defendants. For these reasons, Canady, Haddad, Munroe, and Sullivan cannot have conspired with the Holzer Clinic or with each other to restrain trade.

The anti-trust allegations are all in relation to the Protective Covenant and termination from Holzer Clinic. The cessation of Georgandellis's medical privileges at HMC was not alleged to be in violation of anti-trust laws. Furthermore, the cessation of medical privileges at one

---

[9]Georgandellis asserts Canady was also Chief of Surgery of the Holzer Clinic until July 19, 2005. Though employed with the Clinic at one time, all of the alleged retaliatory action, including termination and enforcement of the Protective Covenant, occurred after his employment with the Holzer Clinic had ceased.

hospital would not violate anti-trust law. *See Gentile*, 2006 WL 2505915 at * 6 (quoting *Sokol v. Akron Gen. Hosp.*, No. 5:95CV1108, 1997 LEXIS 22078, at *32 n.4 (N.D. Ohio Sep. 30, 1997), rev'd on other grounds, 173 F.3d 1026 (6th Cir. 1999)) (the loss of staff privileges "does not harm the consumer of medical services, but simply constitutes a personal harm to the individual physician"); *see also Austin v. McNamara*, 979 F.2d 728 (9th Cir. 1992) (injury to a single physician-competitor in a single hospital, rather than injury to market competition, does not establish an antitrust injury). And, termination alone could not violate anti-trust law. *See Gentile*, 2006 WL 2505915 at * 6 ("the mere fact that one disappointed competitor must practice elsewhere does not constitute an antitrust injury"). It is the Protective Covenant that is at the heart of, and necessary to, Georgandellis's anti-trust claims.

The parties to the Protective Covenant are the Holzer Clinic and Georgandellis. Defendants HMC, Canady, Munro, Sullivan, and Haddad are not parties to, or mentioned in the Protective Covenant.[10] None of the Defendants, besides the Holzer Clinic, entered into the Protective Covenant with Georgandellis or had authority to enforce the Protective Covenant. Because Defendants Canady, Haddad, Munroe, and Sullivan could not have conspired with Holzer Clinic, the § 1 anti-trust claim against them fails. In addition, because Georgandellis has only alleged "monopoly power" related to a § 2 violation on behalf of the Holzer Clinic and HMC and has not asserted any Individual Defendants were monopolizing, or attempting to monopolize, trade or commerce, the § 2 anti-trust claim against them fails. (*See id.* § 114); *see also Smith*, 703 F.2d at 954 ("[t]o establish the offense of monopolization a plaintiff must show

---

[10]HMC may very well be an employer of Georgandellis. This does not change the fact, however, that HMC is not a party to the Protective Covenant.

that a defendant either unfairly attained or maintained monopoly power"). Finally, because these Individual Defendants could not individually enforce or conspire to enforce the Protective Covenant, the state anti-trust claim against them fails. Accordingly, Canady, Haddad, Munroe, and Sullivan's motion to dismiss the anti-trust claims is thereby **GRANTED**.[11]

---

[11]Georgandellis asserts that he intended for the Amended Complaint to read: "The Holzer Clinic engaged in concerted action with the Holzer Medical center and defendants Canady, Munroe, Sullivan and Haddad engaged in concerted action with each other to bring about the termination of the plaintiff and enforcement of the protective covenant . . ." (Response to Clinic p. 12). There are three problems with Georgandellis's assertion.

First, this is **not** the language that is in the Amended Complaint. The Amended Complaint alleges a conspiracy between the Holzer Clinic and HMC and Defendants Canady, Munroe, Sullivan and Haddad. Nowhere does the Amended Complaint allege a conspiracy between the Individual Defendants. According to Georgandellis, "[s]uch language appeared in an earlier draft of the Amended Complaint, but was inadvertently deleted before the FAC was filed." (*Id.* pp. 12-13). Georgandellis cannot amend his Amended Complaint by stating in his Response to the Motion to Dismiss what he meant to put in his Amended Complaint.

Second, Georgandellis asserted, that though this language was missing, he "plans to seek leave to file a Second Amended Complaint to reflect the language of the prior draft." Georgandellis filed his Response on October 10, 2008. It has been seven months, and Georgandellis has not moved to amend his Amended Complaint. This Court must decide these motions based on the Amended Complaint that is filed.

Third, even accepting the proposed language that Georgandellis asserts should have been in his Amended Complaint, the claim against the Individual Defendants would still be dismissed. Georgandellis has not alleged that any of the Individual Defendants had any role in the creation or enforcement of the Protective Covenant. The only defendant with the power to enforce the Protective Covenant is the Holzer Clinic, and the Individual Defendants could not have conspired with the Holzer Clinic pursuant to the doctrine of intracorporate immunity. If the Individual Defendants only conspired with each other as individuals, which is what Georgandellis asserts he intended to allege in the Amended Complaint, they would have no way of enforcing the Protective Covenant, as they were not parties to that contract and had no rights under that contract. Furthermore, no "independent personal stake" has been alleged on the part of any of the Individual Defendants. Without a connection to the Protective Covenant and without an independent personal stake, the Independent Defendants could not have conspired with each other to violate the anti-trust laws.

### 3. Individuals' Participation

The Individual Defendants also assert that the claim for violation of federal and state anti-trust laws must be dismissed as to them because Georgandellis has failed to specify how each Individual Defendant allegedly violated anti-trust laws.

> It is well settled that a corporation's agents and officers may be held personally liable if they participate in or authorize corporate activities that violate antitrust laws. An allegation of individual liability must be founded on specific acts. Antitrust decisions addressing issues of individual liability stress that in order for personal liability to attach **there must be a showing of the individual's participation in the alleged conduct**. Participation may be found in direct action, knowing approval or ratification of the alleged wrongful acts.

*A & D Supermarkets, Inc., No. 2  v. United Food and Commercial Workers, Local Union 880*, 732 F.Supp. 770, 779 (N.D. Ohio 1989) (emphasis added). In *A & D*, the complaint had failed to specify which of the individual defendants participated in each alleged wrongful act in violation of the anti-trust laws. *Id.* at 780. The complaint also failed to state the specific nature of the individual defendants' roles in the conduct alleged to be in violation of the anti-trust laws. *Id.* The Court held, "[a]bsent a showing of specific allegations of the individual defendants acts and conduct in support of plaintiffs' claims against the individual defendants those claims cannot stand." *Id.*

The Amended Complaint avers that Sullivan and Munro made false representations to shareholders. (Am. Comp. ¶ 87). After these representations were made, Georgandellis was terminated. (*Id.* ¶ 90). It is the termination **and** enforcement of the Protective Covenant, however, that are alleged to be an anti-trust violation. (*See id.* ¶ 108, 109). The termination, on its own, does not violate any anti-trust law, because on its own, it would simply prevent Georgandellis from practicing at one clinic. *See Gentile*, 2006 WL 2505915 at * 6 ("the mere

fact that one disappointed competitor must practice elsewhere does not constitute an antitrust injury"). And, there is no allegation that Sullivan or Munro had anything to do with the drafting or enforcement of the "Protective Covenant." Furthermore, there is no allegation that the other Individual Defendants charged with anti-trust violations, Canady and Haddad, had any connection with Georgandellis's termination or with the Protective Covenant. The lack of specification as to how each Individual Defendant allegedly violated the anti-trust laws is, therefore, further grounds for dismissal of the anti-trust claims against Canady, Haddad, Munroe, and Sullivan.

## D. Defamation

In Ohio, defamation is defined as a false written or spoken publication, "made with some degree of fault, reflecting injuriously on a person's reputation or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession." *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651 N.E. 2d 1283, 1289 (Ohio 1995). In order to survive a motion to dismiss, a plaintiff must allege the five elements of defamation: (1) a false and defamatory statement, (2) about plaintiff, (3) published without privilege to a third party, (4) with fault of at least negligence on the part of the defendant, and (5) that was either defamatory per se or caused special harm to the plaintiff. *Gosden v. Louis*, 687 N.E.2d 481, 488 (Ohio Ct. App. 1996). As for the fifth element, "[w]hen a complaint alleges defamation per se, damages are presumed." *Williams v. Gannett Satellite Info. Network, Inc.*, 834 N.E. 2d 397, 399 (Ohio Ct. App. 2005). Words that have the "tendency to injure the plaintiff in his trade or occupation" are considered defamatory per se. *Id.* at 400.

Georgandellis alleges in his Amended Complaint:

Defendants have made false and defamatory statements about the Plaintiff to the shareholders and employees of the Clinic, employees of the Medical Center, persons in the community, and the Plaintiff's prospective employers. Such statements have injured the Plaintiff, severely injured his reputation, and prevented him from obtaining employment.

(¶ 124).

## 1. Specific Information About Claim

Defendants contend that Georgandellis fails to alleges what statements were made, to whom these allegedly defamatory statements were made, or when they were allegedly made. Defendants claim that Georgandellis's failure to provide specific information about his defamation claim warrants the dismissal of such claim.

A review of the allegation in the Amended Complaint demonstrates that Georgandellis has sufficiently pleaded statements that were defamatory per se. Georgandellis alleges that on November 1, 2007, Defendant Sullivan "falsely and maliciously accused. . . [Georgandellis] of verbally abusing patients, euthanizing a patient, being the 'worst physician' on the Clinic's staff, violating HIPAA, and having wrongfully accused Dr. Canady of committing fraud." (Am. Comp. ¶ 74). Georgandellis alleges that Sullivan and Munroe, "repeated the same false representations about the Plaintiff as previously offered at the earlier shareholders meeting on November 1, 2006 and included additional allegations concerning his conduct." (*Id.* ¶ 87). Georgandellis finally asserts that following his termination, the Defendants "told prospective employers that the Plaintiff was abusive towards patients, called patients names, and did not treat

patients with respect, preventing the Plaintiff from securing employment." (*Id.* ¶ 92).[12] Taking Georgandellis's allegations as true, these statements are defamatory per se because they reflect negatively on him as a medical doctor and have a tendency to injure him in his occupation.

## 2. Published Without Privilege

Defendants contend Georgandellis's claim also fails because it was not "published without privilege to a third party." According to Defendants, the statements made by Munroe and Sullivan were made to other shareholders. As a shareholder of Holzer Clinic, Georgandellis could not be removed/terminated absent a two-thirds vote form all shareholders. As such, Defendants assert the other shareholders were privileged to hear the allegations made against Georgandellis.

In *Knox v. Neaton Auto Products Mfg., Inc.*, 375 F.3d 451 (6th Cir. 2004), the case Defendants rely on for support, the Court found "a communication **made in good faith** on a matter of common interest between an employer and an employee, or between two employees concerning a third employee, is protected by a qualified privilege." *Id.* at 460 (emphasis added). It is asserted that the allegedly defamatory statements were made "falsely and maliciously," and thereby not in good faith. As such, Georgandellis has sufficiently alleged that these statements were "published without privilege to a third party."

Because Georgandellis has sufficiently alleged the elements of a defamation claim, the Defendants motions to dismiss this claim are **DENIED**.

---

[12]Specifically, Georgandellis claims that officials at the Holzer Clinic and HMC made these statements to Pleasant Valley Hospital, several medical staffing agencies, and other potential employers. (Id. ¶¶ 93-94).

### E. Breach of Contract

The HMC Defendants assert that Georgandellis did not have a contractual relationship with the HMC Defendants. The HMC Defendants were not parties to the Amended and Restated Code of Regulations of the Holzer Clinic and were not parties to the Protective Covenant. There is no allegation in the Amended Complaint that the HMC Defendants, who were not parties to those agreements, were responsible in any way for the alleged breaches of those agreements. Georgandellis offers no opposition to the HMC Defendants' motion to dismiss this claim. For these reasons, the HMC Defendants' motion to dismiss this claim is **GRANTED**.

### F. Declaratory Judgment

The HMC Defendants assert that the declaratory judgment claim relates solely to the enforcement of the Protective Covenant, and therefore, must be dismissed as to the HMC Defendants because they were not parties to the agreement. Georgandellis offers no opposition to the HMC Defendants' motion to dismiss this claim. For these reasons, the HMC Defendants' motion to dismiss this claim is **GRANTED**.

### G. Interference with Business, Contractual, and Economic Relations

Under Ohio law, "the torts of interference with business relationships and contract rights generally occur when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." *A & B-Abell Elevator Co.*, 651 N.E.2d at 1294. Georgandellis asserts the HMC Defendants are liable under this cause of action for inducing the Holzer Clinic to breach its contract with Georgandellis. (Am. Comp. ¶ 122). He asserts the HMC Defendants are also liable for intentionally interfering with Georgandellis's prospective business or

contractual relations by making false and malicious accusations to prospective employers that Georgandellis was abusive towards patients, called patients names, and did not treat patients with respect, which caused prospective employers not to hire or contract with him. (*Id.* ¶¶ 92-96, 123). The HMC Defendants assert that the interference with business, contractual, and economic relations claim must be dismissed as to the HMC Defendants.

**1. Tortious Interference with Georgandellis's Contract with the Holzer Clinic**

The elements of the tort of tortious interference with contract are: (1) the existence of a contract; (2) the wrongdoer's knowledge of the contract; (3) the wrongdoer's intentional procurement of the contract's breach; (4) lack of justification; and (5) resulting damages. *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 855 (Ohio 1999). Georgandellis asserts the HMC Defendants are liable for tortious interference with Georgandellis's employment contract with the Holzer Clinic because they induced or otherwise purposely caused the Holzer Clinic to breach its contract with Georgandellis. The only element the HMC Defendants challenge is the third element---that the HMC Defendants intentionally procured the contract's breach.

Georgandellis alleges that the Defendants "fabricated charges against the Plaintiff, accusing him of being disruptive, having anger management problems, calling patients 'fat,' and having 'poor' bedside manners"; "transferred [him] to an office that lacked the knowledgeable personnel required to perform the complex work of Nephrology and Critical Care, substantially affecting his ability to properly care for his patients"; "continued to harass the Plaintiff and interfere with his medical practice"; "demanded that he stop performing Quality Assurance work . . . [that] he was required by federal law [to perform]"; and "prohibited him from practicing

medicine at the Medical Center." (*Id.* ¶¶ 50-51; 76-78). Accepting these allegations as true, Georgandellis has sufficiently alleged that HMC intentionally induced the Holzer Clinic to breach its contract with Georgandellis by degrading Georgandellis's performance under the contract and interfering with his ability to perform his job under the contract

## 2. Tortious Interference with Prospective Business Relations

A claim for tortious interference with prospective business or contractual relations requires proof that one intentionally or improperly interfered with another's prospective contractual relations by either: "(a) inducing or otherwise causing a third person not to enter into or continue with a prospective relation or (b) preventing the other from acquiring or continuing a prospective relation." *Walter v. Murphy*, 573 N.E.2d 678, 679 (Ohio Ct. App. 1988) (internal quotations omitted). Georgandellis's Amended Complaint alleges that Defendants have improperly interfered with Georgandellis's business and economic relations by causing prospective employers not to enter into a business relationship with him when he sought employment after his termination.

Georgandellis alleges that following his termination he had prospective business relations with new employers, such as Pleasant Valley Hospital, with whom he was seeking employment. (Am. Comp. ¶¶ 92-94). He alleges that "officials and representatives of the Medical Center . . . told prospective employers that the Plaintiff was abusive towards patients, called patients names, and did not treat patients with respect, preventing the Plaintiff from securing employment" (Am. Comp. ¶ 92). Accepting these allegations as true, Georgandellis has sufficiently alleged that HMC tortiously interfered with Georgandellis's prospective business relations by telling prospective employers that Georgandellis treated patients badly, thereby causing those

prospective employers not to hire him.

The HMC Defendants' motion to dismiss the interference with business, contractual, and economic relations is thereby **DENIED**.

## V. CONCLUSION

For the foregoing reasons, the Court: (1) **DENIES** the Clinic Defendants' motion to dismiss the FCA claim; (2) **DENIES** the Clinic Defendants' motion to dismiss the state and federal anti-trust claims; and (3) **DENIES** the Clinic Defendants' motion to dismiss the defamation claim. The Court, however: (1) **GRANTS** the Individual Clinic Defendants' motion to dismiss the FCA claim; (2) **GRANTS** the Individual Clinic Defendants' motion to dismiss the state and federal anti-trust claims (these claims were only brought against Canady, Munro, and Sullivan); and (3) **GRANTS** the Individual Clinic Defendants' motion to dismiss the Ohio Whistleblower claim.

The Court: (1) **DENIES** the HMC Defendants' motion to dismiss the FCA claim; (2) **DENIES** the HMC Defendants' motion to dismiss the Ohio Whistleblower claim; (3) **DENIES** the HMC Defendants' motion to dismiss the state and federal anti-trust claims; (4) **DENIES** the HMC Defendants' motion to dismiss the defamation claim; (5) **GRANTS** the HMC Defendants' motion to dismiss the breach of contract claim; (6) **GRANTS** the HMC Defendants' motion to dismiss the declaratory judgment claim; and (7) **DENIES** the HMC Defendants' motion to dismiss the tortious interference with business, contractual, and economic relations claim. Of the remaining claims against the Individual HMC Defendants, the Court: (1) **GRANTS** the Individual HMC Defendants' motion to dismiss the FCA claim; (2) **GRANTS** the Individual HMC Defendants' motion to dismiss the Ohio Whistleblower claim; (3) **GRANTS** the

Individual HMC Defendants' motion to dismiss the state and federal anti-trust claims (these claims were only brought against Haddad); (4) **DENIES** the Individual HMC Defendants' motion to dismiss the defamation claim; and (5) **DENIES** the Individual HMC Defendants' motion to dismiss the tortious interference with business, contractual, and economic relations claim.

The claims remaining in this case are: (1) the FCA claim against the Holzer Clinic and HMC; (2) the Ohio Whistleblower claim against the Holzer Clinic and HMC; (3) the state and federal anti-trust claims against the Holzer Clinic and HMC; (4) the defamation claim against all Defendants; (5) the breach of contract claim against the Holzer Clinic; (6) the declaratory judgment claim against the Holzer Clinic Defendants; and (7) the tortious interference with business, contractual, and economic relations claim against all Defendants.

**IT IS SO ORDERED.**

**s/Algenon L. Marbley**
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT COURT**

**Dated: June 5, 2009**